IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 3, 2008 Session

## ANTHONY BROWN v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Obion County**
**No. C06-410     William B. Acree, Jr., Judge**

_____

**No. W2007-02402-CCA-R3-PC   -   Filed November 5, 2008**

_____

The petitioner, Anthony Brown, was denied post-conviction relief by the Circuit Court for Obion County from his convictions for first degree murder, especially aggravated robbery, and especially aggravated burglary and the resulting effective sentence of life without parole in the Department of Correction.  He appeals and contends that he is entitled to post-conviction relief because (1) he was denied the effective assistance of counsel, and (2) the state engaged in improper closing argument. We affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

James T. Powell, Union City, Tennessee, for the appellant, Anthony Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and James T. Cannon, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The facts underlying the petitioner's convictions were summarized by this court on direct appeal:

> On the morning of May 1, 2003, Hilon Pruitt, the victim in this case, did not show up for work. Concerned, Jerry Sherrill, Sr., and William Crowell ("Mustard"), two co-workers and friends of the eighty-one-year-old victim, went to his residence where they discovered his body lying face up in the living room. A console television was turned over and lying on his legs, butcher knives were sticking out of his abdomen and neck, and an ice pick protruded from the center of his neck. A portable television that had been smashed

down on his head was lying beside his body. Sherrill and Mustard lifted the television off the victim's legs and called the police.

Police officers, Tennessee Bureau of Investigation (T.B.I.) Agent Joe Walker, and the county medical examiner, Dr. Allen C. Gooch, soon arrived at the scene. Inside the home, Agent Walker searched for fingerprints left by the assailant, finding a blood pattern in the dining room and a palm print on the back of the television. The pattern in the print on the television indicated that the assailant had worn gloves. The unidentified assailant left the kitchen utensil drawer open and the victim's billfold lying beside his body. Although the billfold contained no cash, approximately $900 was found in the victim's front right shirt pocket. A trigger guard and a firing mechanism also [lay] next to the victim's body, but no gun was ever recovered.

Based upon the condition of the victim's body, Dr. Gooch determined the time of death to have been between 7:00 p.m. and 12:00 a.m. on the previous night of April 30, 2003. An autopsy revealed that the cause of death was the result of multiple injuries, including eight major stab wounds to the victim's body as well as blunt injuries to his head and neck. Dr. O.C. Smith, who was responsible for performing the autopsy, could not determine whether an unfound item may have caused some of the injuries or whether more than one assailant perpetrated the crime.

The defendant was charged with the crimes based upon the testimony of several witnesses. However, initially, several other suspects were considered due to their histories, including Scott Haynes. Haynes was stopped by police officers for questioning regarding a separate home invasion that occurred in Crockett County two nights after the murder of the victim in this case. This home invasion also involved the assault of an older man. When stopped, Haynes took off running. An inventory search of Haynes' vehicle uncovered a glove with a weave pattern similar to the weave pattern in the print found at the victim's home. However, the glove was a common "stock variety glove," and the palm print was never checked against that of Haynes. Because no physical evidence connected Haynes to the crime, Agent Walker ultimately disregarded Haynes as a potential suspect. Furthermore, Haynes had an alibi: his stepdaughter, Joyce Cavness, stated that Haynes was having a cookout the night of April 30, 2003, and that she was there until 8:30 p.m. or 9:00 p.m.

At trial, the victim's daughter, Linda Brown, testified that her father would have been asleep by 9:00 p.m. and that he did not leave her house on the night of April 30, 2003, until about 7:15 p.m. Milton Snow testified that he received a call from his nephew, the defendant, around 8:40 p.m. on the evening of the murder. Snow, who stated that he was babysitting at the time, testified that the defendant confessed to killing the victim. Snow stated that the defendant admitted to stabbing the victim and to pushing a television onto his head. Snow stated that the defendant showed him twelve dollars stained with blood which he stated that he had stolen from the victim.

Joshua McElrath testified that he saw the defendant on the basketball courts on Nash Street at about 8:30 p.m. on the night of the victim's murder. Contrary to Snow's testimony that he was babysitting, McElrath stated that Snow was at the basketball courts with him and the defendant. The defendant looked "like he had just got out of the shower or something . . . he was nervous." McElrath testified that the defendant then confessed the crime to him, stating that "the old man jumped on his back" and that he just "snapped and he killed him." At first McElrath did not believe the defendant, so he followed the defendant over to the victim's house and saw "the old man laying on the floor with some knives in him." McElrath stated that the defendant did not implicate anyone else in the crime.

Robbie Walker testified that [she] saw the defendant coming from the side of the victim's house about four days prior to the murder and that he appeared nervous and sweating. She remembered overhearing the defendant recount the murder while she pretended to be asleep. Walker stated that the defendant admitted that "he got high off some pills, and he didn't have nothing to do, so he went over there and he beat the old man till his arms got tired, then he started sticking the old man." Walker stated that the defendant referred to the victim's blood as red "Kool-Aid," the defendant's favorite color. Contrary to Walker's belief that the defendant was speaking to Snow and "Tie Dye," an alleged nickname for Stacey Parham, Parham denied ever being present. Parham stated it was only later that he asked the defendant about the crime and was told "stay out of my business."

During the course of the trial, the State also introduced several witnesses who testified that, while in jail, the defendant admitted his involvement in the crime. Timothy McPherson, who stated that he was in the same jail pod with the defendant, testified that the defendant told other inmates that he had messed up his life because he killed a man over twelve dollars.

Joseph Isbell testified that the defendant was showing crime scene pictures that he had received from his lawyer around in jail. Isbell stated that the defendant admitted to the crime, but implicated a second assailant. Isbell testified that the defendant admitted to getting the knives out of the victim's drawer and that he was retaliating because the "man was calling the police and stuff on him saying they was trafficking and stuff, a lot of trafficking."

Jerry Sullivan also testified to overhearing the defendant admit to the murder while in jail. Sullivan stated:

> [The defendant] told about how they got together, him and this dude got high, snorted some powder, smoked some weed, and told the dude they was going to get him. So he snuck up on him in his house, and dude was bending over looking at the television, or doing something, and he snuck up on the dude and told the dude, "Hey, what did I tell you about what I was going to do to you?" So when the dude turned around-see, I didn't know it was an old man at that time. I thought it was a young dude about like our age, that he was trying to interfere with dude's business out there on the street . . . . So when dude turned around, he said, "Didn't I tell you what I was going to do to you," the old man said, "Whatcha doing here," and he stabbed him in the stomach.

Sullivan also testified that the defendant implicated another assailant in the crime.

Timothy Carr was also in the same jail pod with the defendant. Carr testified that the defendant "admitted to doing some of it, but he said he didn't act alone." Carr stated that the defendant implicated McElrath as the other assailant. Carr further testified that the defendant has threatened him and asked him to ensure that Snow and Walker were not available to testify. According to Lieutenant Rick Kelly of the Union City Police Department, the defendant is affiliated with the Vice Lords, whereas Carr is affiliated with a rival gang, the Gangster Disciples.

The defense argued that T.B.I. forensic scientists, Darrin Shockey and Donna Nelson, were not able to match any physical evidence from the scene to the defendant. The only DNA present under the victim's fingernails and at the scene was either the victim's own or matched to an unknown person. The defense urged the jury

to consider the possibility that the crime was committed by one of the other initial suspects. Kay Perkins, who lived near the victim, testified to seeing Haynes and another man riding up and down the streets in the neighborhood "a couple of days to a week prior to the murder." Nolan Simms also testified to seeing Haynes in the area near the time of the murder, at Jerry Sherrill's salvage yard. Ann Sellers, another neighbor, saw a "strange car" pull into the neighborhood on the night of the victim's murder. Sellers testified that two white males "dressed like womens" exited the car and then, about twenty or thirty minutes later, "left like they was in a hurry."

The defense also attempted to introduce the testimony of Pam Byrd, and the State requested "a jury-out hearing on the relevance." Byrd was stabbed about twelve years ago by her ex-husband, Robert Kimmons, another initial suspect in this case. The defense sought to introduce her testimony because "it demonstrates that one of the two suspects . . . had a tendency to use a knife." The trial judge sustained the State's objection to the testimony, stating: "she will not be allowed to testify to something that Mr. Kimmons did 12 years ago. There's nothing to tie Mr. Kimmons to this case."

State v. Anthony Dwayne Brown, No. W2004-01139-CCA-R3-CD, Obion County, slip op. at 1-4 (Tenn. Crim. App. Apr. 18, 2005) (footnote omitted), app. denied (Tenn. Oct. 24, 2005).

The petitioner filed a petition for post-conviction relief, and counsel was appointed. The court conducted a hearing on the petition. The evidence at the hearing related to the petitioner's allegation that trial counsel had not provided him with the effective assistance of counsel in the conviction proceedings.

At the hearing, trial counsel testified that he met with the petitioner several times and received the names of potential witnesses. He said he had information that before his involvement in the case, the authorities suspected individuals named Scotty Haynes and Robert Kimmons of committing the crimes. He said he spoke with Special Agent Joe Walker about these individuals and learned that Haynes had been arrested in Minnesota and Kimmons was in the Crockett County Jail. He said his investigators were unable to talk to Kimmons because his attorneys would not allow it. He said he encouraged Rick Kelly of the Union City Police Department to talk to Kimmons, as well, but that he did not think Kelly ever did so despite his having talked to Kelly on a near-daily basis for several weeks. He said he also attempted to convince Walker and Kelly to go to Minnesota and obtain a palm print from Haynes for comparison with one found at the crime scene but that they would not do so. He said he thought it would have been a waste of time to subpoena Kimmons for trial because Kimmons' lawyers probably would have been successful in having the trial court rule that Kimmons would not testify and that even if Kimmons did take the stand, he would probably invoke his Fifth Amendment privilege. Counsel acknowledged that he knew the authorities had discovered a bloody glove print in the victim's home as well as a glove with the same pattern in Haynes' car.

Trial counsel testified that he presented evidence of a woman who had seen two white men, one of whom was identified as Haynes, driving around the neighborhood where the victim lived a week or two before the murder. He said there was evidence Haynes was at a cookout on the evening of the crimes but that he was able to show that Haynes nevertheless had the opportunity to commit the crimes after he left the cookout.

Trial counsel testified that he presented evidence that Kimmons had a friend whose father was a friend of the victim. He said he did this in an attempt to connect Kimmons and Haynes to the victim's murder.

Trial counsel testified that he talked to the victim of a similar crime committed by Haynes and Kimmons. Counsel said the victim claimed that a twelve-year-old Mexican boy who told him that Haynes had said he thought he had committed a murder and needed to get out of town. He said he was able to get a deputy sheriff to speak with the child but that the child "was not at all helpful."

Trial counsel testified that the petitioner identified Tanika Brown, Frederick Pirtle, and Laretha Bledsoe as alibi witnesses. He said that to the best of his recollection, he investigated Mr. Pirtle and Ms. Bledsoe and both were "dead ends." He said that to the best of his memory, Ms. Brown had given a statement to the authorities which was inconsistent with what the petitioner told him she would say. He said he had a memorandum which reflected that Ms. Brown told the authorities that she did not remember being with the petitioner on April 30 or May 1, 2003. He said that he had investigated Ms. Bledsoe and that he thought he recalled that she was the petitioner's girlfriend and that she had been with him beginning at midnight or 1:00 a.m. on the night of the crimes and through the rest of the night. He said the petitioner told him that he spent the night with Laretha Bledsoe but that he gave accounts which varied the time the petitioner and Ms. Bledsoe got together from 10:00 p.m. until 1:00 a.m. He said that based upon the evidence about when the murder occurred, these witnesses would not have helped the defense because they could not account for the petitioner's whereabouts during all of the relevant time period. He stated that the petitioner provided him with inconsistent information about the identity of his alibi witnesses and that for this reason, he had listed only Tanika Brown on the Notice of Alibi.

Trial counsel testified that he did not specifically recall having talked with the petitioner about the petitioner's right to testify. He said he did not recall what advice he gave the petitioner about whether he should testify and admitted he might have advised the petitioner not to testify. He said, however, that despite his lack of memory, he thought he would remember had the petitioner had any objection to not testifying or any lack of understanding of his rights.

The petitioner testified that he gave trial counsel the names Frederick Pirtle and Tanika Brown as potential alibi witnesses. He said trial counsel told him he had his investigator speak to Ms. Brown and that she remembered being with the petitioner but could not recall at what time. He claimed at one point that counsel did not contact Mr. Pirtle, but he said later that counsel told him he had contacted Mr. Pirtle. He said counsel told him the witnesses would not be helpful if they could not establish the exact times they were with the petitioner on the night of the crimes. He said he was with Mr. Pirtle and Ms. Brown from about dark until 11:00 p.m. or 12:00 a.m. The petitioner denied trial counsel's assertion that the petitioner had changed his alibi information. He stated that

he had always told counsel that he was with both Mr. Pirtle and Ms. Brown and that he had never mentioned an additional person or said that Mr. Pirtle or Ms. Brown were not present. He said counsel also failed to call Laretha Bledsoe as a witness, who could verify that he was with Mr. Pirtle and Ms. Brown and that he was with her afterwards. He said he had identified Ms. Bledsoe to counsel but that counsel did not call her as a witness.

The petitioner testified that he wanted to testify but that counsel told him he had an attitude problem and would not be believed. He said counsel did not explain to him his right to testify. He said he did not testify because counsel advised him not to do so. He believed, however, that his testimony would have been beneficial to the defense. The petitioner acknowledged that he was asked on the witness stand whether he wanted to testify and that trial counsel asked the court to be allowed to talk with him further. He admitted that after talking with counsel, he returned to the stand, where he acknowledged that he had been advised of the advantages and disadvantages of testifying and stated that he did not want to testify. He testified at the post-conviction hearing, however, that he had answered the questions about whether he would testify as trial counsel had instructed, rather than giving accurate responses.

Laretha Bledsoe testified that she had known the petitioner for years and that she had seen him on the night of the victim's murder. She said that no one from the public defender's office talked to her around the time of trial, although she had spoken with a police officer, whom she told she saw the defendant with his cousin Tanika and Fred Pirtle around 8:30 or 9:00 p.m. She said she and the petitioner "called each other back and forth" after that and that the petitioner picked her up and took her to his house around 11:00 p.m. or midnight, where she stayed with him until the following afternoon. She said that she was subpoenaed for trial by the state but that she was never called as a witness. She said that had she been called to testify at trial, she would have testified in accord with her testimony at the post-conviction hearing.

Ms. Bledsoe acknowledged, however, that she had given a statement to the authorities saying that on April 30 between 11:00 p.m. and midnight, she had seen the petitioner and Tanika Brown riding around. She said she did not say anything in this statement about Fred Pirtle being in the car with the petitioner and Ms. Brown because she had not been asked. She admitted that in this statement, she said that the petitioner came to get her at 1:00 or 2:00 a.m. She testified she was not sure exactly what time the events happened.

Frederick Pirtle testified he was with the petitioner on the night of the murder. He said they had been "moseying around" the neighborhood drinking from 8:00 p.m. until about 2:30 or 3:00 a.m. He said he was never interviewed by anyone from the police department or the public defender's office. He acknowledged that he had been interviewed by the police after the petitioner's conviction but denied that he remembered that he told them he actually might have been with the petitioner the night before the crimes.

The trial court found that the petitioner failed to prove his claims by clear and convincing evidence. The court denied relief. This appeal followed.

The petitioner claims that he is entitled to post-conviction relief because (1) he received the ineffective assistance of trial counsel and (2) the state made improper closing argument at trial. The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103.

**I**

We consider first the petitioner's claim that counsel was ineffective. He argues that counsel failed to interview witnesses and other suspects and that counsel erroneously advised him against testifying.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., 104 S. Ct. at 2068. Failure to satisfy either prong results in the denial of relief. Id. at 697, 104 S. Ct. at 2069.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference

is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201.

## A.    Witnesses:  Tanika Brown, Fred Pirtle, and Laretha Bledsoe

The petitioner complains that trial counsel failed to interview Tanika Brown, Fred Pirtle, and Laretha Bledsoe.  He argues that counsel relied on information from others to discount Ms. Brown as a witness and did not have anyone contact Mr. Pirtle or Ms. Bledsoe.  He also argues that although Ms. Bledsoe had been subpoenaed by the state and was present at trial, counsel failed to call her as a witness when the state did not do so.

Mr. Pirtle and Ms. Bledsoe testified at the post-conviction hearing.  Ms. Brown did not.  The trial court found that counsel interviewed Ms. Brown but that she said she did not remember being with the petitioner on the night of the crimes.  The court found that Mr. Pirtle was not a credible witness and that his testimony conflicted with that of Ms. Bledsoe.  Further, the court found that if either Mr. Pirtle's or Ms. Bledsoe's testimony were accredited, the petitioner would not have established an alibi because under either scenario, he still had time to commit the crimes before meeting these people.  Likewise, the court noted the overwhelming evidence of the petitioner's guilt at trial.  The court found that the petitioner failed to establish his claim by clear and convincing evidence.  We hold that the evidence does not preponderate against the trial court's findings.

## B.    Suspects:  Scott Haynes and Robert Kimmons

The petitioner also complains that counsel failed to interview potential suspects Haynes and Kimmons, failed to investigate their involvement, and failed to call them as witnesses.  The trial court found that the petitioner had failed to demonstrate that Haynes and Kimmons were responsible for the crimes and noted that there had been evidence at the petitioner's trial that they had been considered but eliminated as suspects. The court found that the petitioner had failed to demonstrate any prejudice from counsel's course of action.  We hold that the evidence does not preponderate against the trial court's findings.

## C.    Advice About Testifying

The petitioner claims that counsel failed to explain the advantages and disadvantages of testifying.  He argues that despite his declaration that he wanted to testify, counsel told him he should not because he had an attitude problem.  The petitioner contends that counsel made an "apparent unilateral decision" about the petitioner's wish to testify.  The trial court found that the petitioner wanted to testify but that trial counsel convinced him otherwise.  The trial court also reviewed the record of trial and found that the petitioner knowingly waived his right to testify at a hearing conducted pursuant to Momon v. State, 18 S.W.3d 152 (Tenn. 1999).  Thus, the court rejected the claim.  On appellate review, the evidence does not preponderate against the trial court's findings.

The petitioner is not entitled to post-conviction relief based upon his ineffective assistance of counsel claims.

## II

The petitioner also contends that the state made an improper closing argument at trial:

> The third count would be felony murder, first degree murder in the perpetration of a theft. If for whatever reason you didn't feel that there was sufficient proof to show that there was a robbery, there certainly was a theft, because that twelve dollars was taken.
>
> Now, we're asking you to consider both of these [two counts of felony murder] and return a verdict on both of these simply for purposes of appeal. Because if you convict of both, the Court of Criminal Appeals could later reverse one of those, but the other one stands on its own. So that prevents needless retrials. So, that's why we're asking you, even though it's going to take a little longer, we're asking you to consider both of those counts.

The trial court found that the petitioner failed to demonstrate that the argument affected the outcome of the trial or in any way affected the petitioner. On appeal, the petitioner has not articulated any constitutional basis upon which he claims entitlement to post-conviction relief. See T.C.A. § 40-30-103 (providing for post-conviction relief "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States"). We hold that the petitioner has not demonstrated any error in the trial court's ruling denying him relief.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE